UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
BOARD OF EDUCATION OF THE      :
WAPPINGERS CENTRAL SCHOOL     :
DISTRICT,                       :
               Plaintiff,      :        **OPINION AND ORDER**
                            :
v.                              :        19 CV 1730 (VB)
                            :
D.M. and A.M., as the parents of E.M., a  :
student with a disability,         :
               Defendants.    :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Board of Education of the Wappingers Central School District (the "District")

brings this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400, et seq., against defendants D.M. and A.M., the parents (the "Parents") of E.M., a

child with a disability as defined under the IDEA.  The District seeks reversal of a decision by a

state review officer of the New York State Education Department (the "SRO"), dated December

13, 2018, which affirmed a September 12, 2018, impartial hearing officer's (the "IHO") decision

ordering the District to pay E.M.'s tuition at The Ridge School ("Ridge") for the 2017–2018

school year.  The Parents seek to uphold the SRO's decision.

      Now pending are the parties' cross-motions for summary judgment.  (Docs. ##9, 15).

      For the reasons set forth below, the District's motion is DENIED and the Parents' motion

is GRANTED.

      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I.      Statutory Framework

The IDEA was enacted to promote the education of disabled children.  20 U.S.C.

§ 1400(d)(1)(A); see Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

176, 179 (1982) (interpreting predecessor statute to IDEA).[1]  States receiving public funds are

required to provide a free appropriate public education ("FAPE") to children with disabilities.

20 U.S.C. § 1412(a)(1)(A).  Public school districts must provide "'special education and related

services' tailored to meet the unique needs of a particular child, [which are] 'reasonably

calculated to enable the child to receive educational benefits.'"  Walczak v. Fla. Union Free Sch.

Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1401(a)(18) and Bd. of Educ. of the

Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 207).

States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children

with disabilities residing in the State" to determine whether they require special education and

related services.  20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d

Cir. 2006).  This so-called "child find" obligation extends to children who are "suspected of

being a child with a disability."  34 C.F.R. § 300.111(c)(1).

The IDEA also requires states to create an individualized education program ("IEP") for

each disabled student.  See 20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde

Park, 459 F.3d 356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an

IEP for each handicapped child.").  The IEP is a "comprehensive statement of the educational

needs of a handicapped child and the specially designed instruction and related services to be

---

[1]      Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

employed to meet those needs." Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985) (citing 20 U.S.C. § 1401(19)).

In New York State, the responsibility for developing IEPs is assigned to local Committees on Special Education ("CSE"). N.Y. Educ. Law § 4402(1)(b)(1); R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012). "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 175.

If the parents of a disabled child believe the local school district failed to provide a FAPE, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school from the local board of education. See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369–70, 374. In New York, parents seeking such reimbursement must then file a "due process complaint" challenging the appropriateness of the IEP. FB v. N.Y.C. Dep't of Educ., 923 F. Supp. 2d 570, 577 (S.D.N.Y. 2013).

If the parties fail to resolve the complaint, they may proceed with a due process hearing, 20 U.S.C. §§ 1415(f)(1)(B)(ii), conducted by an IHO, see N.Y. Educ. Law § 4404(1). A board of education is required to reimburse parents for private educational services if: (i) the board fails to establish the student's IEP provided a FAPE; (ii) the parents establish their unilateral placement was appropriate; and (iii) equitable considerations favor the parents' claim. See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12–13 (1993); M.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013). The IHO's decision may be appealed to an SRO at the New York State Education Department. See N.Y. Educ. Law § 4404(2); see also 20 U.S.C.

§ 1415(g).  The SRO's decision may then be challenged in federal court.  <u>See</u> 20 U.S.C.

§ 1415(i)(2)(A).

II.  <u>Factual Background</u>

The parties have submitted briefs, statements of material fact pursuant to Local Civil

Rule 56.1, and the record and exhibits from the proceedings below, which reflect the following

factual background.[2]

E.M. is a student with a disability as defined under the IDEA.  At the start of the 2017–

2018 school year, he was eleven years old.  In June 2017, he was diagnosed with "Asperger's

Disorder, Attention or Concentration Deficits, Anxiety Disorder NOS [not otherwise specified],

Specific Developmental Disorder of Motor Function, and Transient Alteration of Awareness."

(Ex. 3 at 3).

A.  <u>2015–2016 School Year</u>

E.M. was evaluated in February 2015, at which point his test scores revealed his

cognitive functioning was in the low average range.  For the 2015–2016 school year (his fourth-

grade year), he was placed in the District's FLEX program, consisting of a special class (a class

comprised of students with disabilities) for reading and math with 15 students, one teacher, and

one teacher's assistant (<u>i.e.</u>, 15:1+1), and integrated co-teaching ("ICT") classes (students with

disabilities taught with non-disabled students) for science and social studies.

---

[2]     "Tr." refers to the transcript of the IHO hearing; exhibits identified by number (<u>e.g.</u>, Ex.
1) refer to the exhibits submitted by the District at the IHO hearing, and exhibits identified by
letter (<u>e.g.</u>, Ex. A) refer to the exhibits submitted by the Parents at the IHO hearing.  In addition,
"IHO Dec." refers to the IHO's decision, dated September 12, 2018, and "SRO Dec." refers to
the SRO's decision, dated December 13, 2018.  Each exhibit, including the IHO and SRO
decisions, is individually paginated; the Court refers to those page numbers when citing to the
exhibits.

B.    2016–2017 School Year

E.M. was again placed in the District's FLEX program for the 2016–2017 school year (his fifth-grade year). E.M.'s reading class, although capable of holding up to fifteen students, typically only had five students, and at most had seven. E.M.'s math class likewise was not at capacity.

E.M. struggled, regressing in both reading and math. He became less engaged during group counseling sessions, and according to his mother, he developed phobias and cried every time his mother brought him to school.

C.    CSE and Re-Evaluations

The CSE convened to re-evaluate E.M. in January 2017. E.M.'s general education teacher noted E.M. was often unfocused and stared off in class; his occupational therapist said E.M. was not being productive and was not trying his best; and his speech therapist said she had also noticed regression. The CSE recommended conducting updated occupational therapy, speech, and psychoeducational testing.

The District's subsequent evaluations showed E.M. "was functioning in the very low range of cognitive ability, demonstrated weaknesses in pragmatic language skills and social interaction, and had limitations in the visual-perceptual, fine motor, and visual integration skills which impacted his performance in school." (SRO Dec. at 4). E.M.'s cognitive functioning had declined significantly since previous tests were conducted in March 2012 and February 2015. He had also regressed in speech—specifically, auditory comprehension—occupational therapy, and visual perception, when compared to his previous testing in 2015. E.M.'s motor functioning was so low it could not be scored.

The CSE re-convened on March 8, 2017. At the CSE meeting, the Parents contested the results of the psychoeducational testing and requested the District fund an independent neuropsychological evaluation.

The independent evaluator, Dr. Simone Collymore, conducted a neuropsychological test evaluation on June 24, 2017, and obtained test scores consistent with the District's test scores of January 2017. Dr. Collymore found "a significant decline across all of the evaluations that he has done" and "a steady decline in terms of those core skills, the verbal skills, the visuospatial skills, working memory, processing speed." (Tr. at 685–86). Dr. Collymore further found E.M.'s "overall cognitive abilities . . . to be in the severely impaired range." (Id. at 692).

The CSE further convened on August 21 and September 8, 2017. After reviewing information from committee members, the CSE recommended E.M. be placed in a 15:1 special class for the 2017–2018 school year, and that E.M. receive occupational therapy, speech-language therapy, and psychological counseling.

The Parents indicated at the CSE meeting they were going to send E.M to Ridge, and on October 20, 2017, through counsel, they further notified the District of their intent to unilaterally enroll E.M. at Ridge. The District provided home instruction to E.M. until E.M. was formally accepted at Ridge. E.M. started at Ridge on November 1, 2017.

III.    Procedural Background

    A.    IHO Hearing and Decision

The Parents filed a due process complaint on February 28, 2018, in which they requested an impartial hearing and sought tuition reimbursement for E.M.'s enrollment at Ridge for the 2017–2018 school year.

An IHO was appointed, and the parties participated in a six-day hearing on May 8, 10, and 15; June 5 and 18; and July 10, 2018. The IHO issued a decision on September 12, 2018, finding the Parents were entitled to an award of tuition reimbursement for the 2017–2018 school year. The IHO found that the District failed to offer E.M. a FAPE for the 2017–2018 school year; that Ridge, although not ideal, was an appropriate unilateral placement for E.M.; and that equitable considerations favored an award of tuition reimbursement.

The IHO offered several reasons to support his finding that the District failed to offer E.M. a FAPE. First, the IHO found a 15:1 class, with only one teacher, inadequate, reasoning:

> The sort of intensive attention that E.M. needs and that his IEP calls for in order to make any progress simply cannot be provided in the context of just one teacher and 15 other students. It is not feasible for a single teacher, however talented, to be able fairly to address E.M.'s unique needs and, at the same time, address the varying needs of 15 other students.

(IHO Dec. at 21).[3] The IHO relied on testimony from E.M.'s teachers and summarized that testimony as follows: "The teachers who had contact with E.M. state very clearly that he responds more positively in a 1:1 or small group setting. They repeatedly say that he can complete a task only with direct support, refocusing and redirecting." (Id. at 20).

Second, the IHO reasoned, "[g]iven the abundant references to E.M.'s need for intensive instruction in order to make any progress and its recognized need to assign him to a fully self-contained program and its recognized limitation on what it could offer to E.M.," the District should have considered alternative placements for E.M.—i.e., placement in a school outside the District. (IHO Dec. at 21–22).

Third, the IHO rejected the District's argument that E.M. was not capable of learning in a 1:1 or small group setting as "not supported by the evidence." (IHO Dec. at 22).

---

[3] There was evidence in the record that the 15:1 class proposed in the IEP already had fifteen students.

Fourth, the IHO found it was not clear that the proposed 15:1 self-contained class would be homogeneous—that is, consisting of children with similar disabilities or needs.

And fifth, "[t]here was some indication in the record that the self-contained 15:1 class to which E.M. was assigned would include students with behavioral issues." (IHO Dec. at 25). The IHO found that placing E.M., who "has been described as a lovely child without behavior issues," in a class with students who may have behavioral issues would not serve E.M.'s needs. (Id.).

As to the finding that Ridge was an appropriate unilateral placement for E.M., the IHO determined Ridge addressed some, but not all, "critical elements for E.M." (IHO Dec. at 27). First, Ridge provided a small class size and 1:1 instruction—"the best way that E.M. learns." (Id.). Second, Ridge provided homogeneity in the sense that all (six) children at Ridge are on the autism spectrum, are verbal, and have some learning difficulties, and none has extreme behavioral issues. Third, Ridge "provide[d] a lot in the way of socialization, interaction with peers." (Id.). And fourth, Ridge provided music and art classes, as well as adaptive physical activity.

In addition, the IHO relied on evidence of E.M.'s meaningful progress in several respects. According to the IHO, Ridge's special education director, Linda Kondor, testified E.M. "has become a lot more verbal and participates in class discussions," "made progress in reading and in listening comprehension and in math computation," and is "much more outgoing and verbal," including playing chess with other students and staff and instructing other students in the game. (IHO Dec. at 28). The IHO also found E.M.'s mother had credibly testified as to E.M.'s academic and social development.

Further, the IHO cited the difference between the results of the Woodcock Reading Mastery Test given to E.M. in March 2017 and June 2018, stating there was "a significant increase in all of the subtests, essentially doubling his percentile scores in fifteen months." (IHO Dec. at 28). The IHO noted, however, that neither Ms. Kondor nor her husband, who administered the tests, had "any serious training in administering this test and have not kept up with professional development courses." (Id.). Although that diminished the impact of the test results, there was "no reason to believe . . . these are artificial results and they can be taken as showing some degree of measurable progress." (Id.).

Nonetheless, the IHO determined placing E.M. at Ridge was less than ideal. Ridge had not provided its own IEP for E.M., did not produce documentation as to its specific plans for E.M., none of the teachers except for Ms. Kondor held a current state teaching certification, there was no production of the specific profiles of the other students at Ridge, and those students ranged in age from 12 (E.M.'s age at the time) to 17.

B.     SRO Decision

In a decision dated December 13, 2018, the SRO upheld the IHO's decision.

Regarding the District's failure to offer E.M. a FAPE, the SRO stated: "Considering the extent of the student's academic deficits, attending difficulties, and weaknesses in socialization, the evidence in the hearing record does not support a finding that the September 2017 CSE's recommendation of a 15:1 special class would have provided sufficient support to address the student's needs." (SRO Dec. at 17). The SRO reasoned E.M. had regressed in special classes as part of the FLEX program, which contained fewer students and more staff in the reading and math classes than there would be in a full capacity 15:1 special class, which the District had proposed for the 2017–2018 school year.

The SRO, like the IHO, rejected the District's argument that the 15:1 placement was appropriate because E.M. would be "homogenously grouped with students with similar cognitive and academic achievement levels." (SRO Dec. at 17). The SRO found the hearing record supported the IHO's determination that "[t]he sort of intensive instruction that [the student] needs and this IEP calls for in order to make any progress simply cannot be provided in the context of just one teacher and 15 other students." (Id. (alterations in original)).

Regarding placing E.M. at Ridge, the SRO found:

> Although the district asserts that the hearing record does not demonstrate how Ridge modified its instruction to address the student's unique needs or how the 1:1 instruction delivered at Ridge was specialized to meet the student's needs, the hearing record supports finding that the student received instruction tailored to meet his academic, attending, and social-emotional needs. Additionally, while a more fully developed hearing record regarding the particularity of the student's instruction at Ridge may have been preferable, courts have recently deemed evidence of the general education milieu of a unilateral placement sufficient for purposes of tuition reimbursement . . . in an apparent retreat from the standard, articulated in [Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105 (2d Cir. 2007)], that the unilateral placement must provide instruction specially designed to meet the student's unique needs, supported by services necessary to permit the student to benefit from instruction.

(SRO Dec. at 26–27 (citations omitted)). The SRO then stated, "the hearing record contained some details regarding how Ridge met the student's unique needs." (Id. at 27). Those details included small group instruction "using group interaction, participation, active question-and-answer sessions, peer modeling, turn-taking, guided peer interactions, and interactive field trips," which addressed some of E.M.'s social skills deficits, allowed for small group instruction, and allowed for 1:1 academic instruction. (Id.). The SRO further noted E.M. also received "multisensory reading instruction, including instruction geared specifically toward remedial reading intervention, as well as 1:1 math instruction focused on the student's level." (Id.). Thus, the SRO concluded:

Accordingly, and particularly in light of the more relaxed standard increasingly applied by courts while evaluating the sufficiency of the 'specialized instruction' required of unilateral placements, the hearing record supports the IHO's finding that Ridge 'adequately addressed some of the student's fundamental needs' making it an appropriate placement for the student for the 2017–18 school year.

In sum, the hearing record does not include much detail regarding the special education instruction that was designed specifically for the student at Ridge; however, it appears that the student benefited from the overall design of the program to the extent described above. Based on the foregoing, the totality of the circumstances presented in this case, including the student's progress at Ridge, supports the IHO's conclusion that although Ridge was 'less than ideal,' Ridge sufficiently addressed the student's needs such that the parents met their burden to establish that Ridge provided the student with instruction and services specially designed to meet his unique needs.

(Id. (alterations and footnote omitted)).

## DISCUSSION

I.     <u>Standard of Review</u>

In federal court, parties seeking review of administrative decisions in cases brought under the IDEA usually do so by motion for summary judgment. See <u>Viola v. Arlington Cent. Sch. Dist.</u>, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). However, unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion. <u>Id</u>. Rather, summary judgment in an IDEA case functions as an appeal from an administrative decision. <u>T.P. v. Mamaroneck Union Free Sch. Dist.</u>, 554 F.3d 247, 252 (2d Cir. 2009).

In this context, the Court (i) reviews the record of the administrative proceedings; (ii) hears additional evidence at the request of a party; and (iii) grants such relief as it deems appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C).

"Although the district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, . . . such review is by no means an invitation to the courts to substitute their own notions of sound educational

policy for those of the school authorities which they review." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d at 112–13. "To the contrary, federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Id. at 113. Indeed, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).

"[T]he deference owed to an SRO's decision depends on the quality of that opinion." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 189. "Reviewing courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." Id. The Second Circuit's approach requires district courts to consider the following:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress. Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

M.H. v. N.Y.C. Dep't of Educ., 685 F.3d at 244.

II.     Tuition Reimbursement

The Parents are entitled to tuition reimbursement for the 2017–2018 school year because a preponderance of the evidence supports the SRO's determinations that (i) the District failed to offer E.M. a FAPE, and (ii) Ridge was an appropriate unilateral placement.[4]

Claims for tuition reimbursement are "governed by the Burlington/Carter Test, which looks to (1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." C.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 76 (2d Cir. 2014); see generally Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369; Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. at 12. The school district has the burden of proving its IEP offered the student a FAPE. R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 184 (citing N.Y. Educ. Law § 4401(c)). If the district "fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." Id. at 185.

A.      FAPE

To decide whether an IEP complies with the IDEA, courts follow a two-part test. See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206–07. At the first step, courts examine the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d at 190. At the second step, courts weigh the substantive adequacy of the IEP by asking whether it was "reasonably calculated to enable the child to receive educational benefits." Id. "Substantive inadequacy automatically entitles the parents to reimbursement, as long as the parents'

---

[4]     The District does not challenge the SRO's ruling that equitable considerations favored the Parents' claim.

alternative placement was appropriate and equitable considerations favor reimbursement." T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 160–61 (2d Cir. 2014).

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017). "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." Id. "The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." Id. Indeed, a school district is not required to provide "every special service necessary to maximize each handicapped child's potential." Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 199.

Here, the SRO's decision that the District failed to offer E.M. a FAPE is entitled to deference, as it was well-reasoned, based on substantially greater familiarity with the evidence and the witnesses than this Court, grounded in thorough and logical reasoning, based on the same evidence as presently before the Court, and concerns the substantive adequacy of the IEP. It also rests on the SRO's determination that the 15:1 class was too large for E.M., and "[d]etermining what class size is appropriate for a student is exactly the sort of policy judgment on which the Second Circuit has instructed that this Court should defer to the SRO." S.A. v. N.Y.C. Dep't of Educ., 2014 WL 1311761, at *13 (E.D.N.Y. Mar. 30, 2014).

Moreover, the SRO's decision is supported by a preponderance of the evidence. The SRO exhaustively recounted E.M.'s "attending difficulties"—that is, difficulties maintaining focus during classroom lessons—which the SRO relied upon in finding a 15:1 special class would not have provided sufficient support to address E.M.'s needs. (SRO Dec. at 11). Among

the evidence the SRO cited were reports and testimony from E.M.'s reading and math special education teachers, school psychologist, and independent psychologist, all of which support the SRO's determination.  The school psychologist's report states that when writing up observations after a small group science activity, E.M. "needed a teacher near him to walk him through each step."  (Ex. 4 at 7).  E.M.'s reading special education teacher testified E.M. "most commonly . . . had a teaching assistant that would sit next to him providing 1:1 support who would redirect, refocus, check for understanding."  (Tr. at 145).  In an email to the school psychologist, the same teacher stated E.M. "needs intense 1:1 support in all academic areas to complete any tasks."  (Ex. 25).  The school psychologist responded stating she had observed E.M. twice, and that she saw "the same things you guys are seeing.  He definitely struggles with group work, large group lessons, and independent work times."  (Id.).  The hearing record also included notes from E.M.'s special education math teacher stating E.M. needed "constant prompting" and "1:1 instruction to complete task[s]."  (Ex. 27 at 1, 3).  E.M.'s IEP likewise indicated that he "needs 1:1 assistance to complete any and all work in our small group math class."  (Ex. 3 at 14).  The independent psychologist also noted that during math class, a 1:1 aide sat with E.M. for most of the observation.  And "although [E.M.] was paired with another student, he worked primarily with the aide."  (Ex. 2 at 10).

The District takes issue with the SRO's conclusion that the IEP's 15:1 special class was insufficient because E.M. "regressed in the special classes as part of the Flex program," which had "fewer students and more staff" than in the classes proposed as part of the IEP.  (SRO Dec. at 17).  The SRO's deduction was logical and supported by the record.  E.M.'s reading class contained around five to seven students, and E.M.'s math class likewise was described as not at capacity and as a "small group math class."  (Ex. 3 at 14).  The parties agree E.M. regressed in

those classes.  Yet, the District recommended placing him in a class with more students—

evidence in the record indicated the intended class was already at its maximum fifteen students—

and with fewer teachers or teachers' assistants.  Logically, with less teaching staff and more

students, E.M. would receive even less support than he received in the FLEX program.

Moreover, combined with the extensive evidence in the record supporting the SRO's

determination that E.M. needed more support, it is logical to conclude placing E.M. in a class

with less support would likely be detrimental.

The District also argues the SRO overlooked the programmatic differences between the

FLEX program and the 15:1 full-day self-contained class.  Specifically, the District asserts the

FLEX program contained students with less severe cognitive impairments, and E.M.'s need for a

high level of support in the FLEX classes can be attributed to his efforts to keep pace with more

proficient peers.  In contrast, according to the District, the students in the full-day self-contained

class would have more closely matched E.M.'s development level, and therefore E.M. would not

need as high a level of support.

The Court is not persuaded.  The SRO specifically considered and rejected this argument,

finding the hearing record supported the IHO's determination and "[t]he sort of intensive

instruction that [the student] needs and that his IEP calls for in order to make any progress

simply cannot be provided in the context of just one teacher and 15 other students."  (SRO Dec.

at 17 (quoting IHO Dec. at 21 (alterations in original))).  As discussed above, the SRO's decision

in that respect is supported by the record and, importantly, "is exactly the sort of policy judgment

on which . . . this Court should defer to the SRO."  S.A. v. N.Y.C. Dep't of Educ., 2014 WL

1311761, at *13.

Moreover, the IHO also rejected the District's argument, finding the District had not demonstrated that E.M.'s peers in the 15:1 self-contained class would "have anything like his particular disability," and that it was "hard to credit fully [the assistant superintendent's] assertion that the class would be homogenous." (IHO Dec. at 24). For this additional reason, the Court rejects the District's argument.

Finally, the District argues the SRO's decision "suggests that the CSE could have only offered [E.M.] an appropriate placement by providing a placement with a significant amount of 1:1 instruction," but that a 1:1 placement is a drastic recourse in light of the IDEA's preference for educating students with disabilities in the least restrictive environment. (Doc. #10 at 24). However, this argument again boils down to whether a preponderance of the evidence supports the SRO's decision that 15:1 was too large a class for E.M.. For the reasons discussed above, a preponderance of the evidence supports the SRO's decision.

Accordingly, the Court affirms the SRO's decision that the District failed to offer E.M. a FAPE for the 2017–2018 school year.

B.    Appropriate Private Placement

The District argues the SRO improperly determined that Second Circuit caselaw permitted him to rely on evidence of Ridge's "general educational milieu" to find Ridge was an appropriate placement for E.M. (SRO Dec. at 27). According to the District, applying the correct standard articulated in Gagliardo and other Second Circuit cases, the Court should find the Parents failed to carry their burden of showing that Ridge was an appropriate placement.

The Court need not determine whether the SRO correctly interpreted Second Circuit precedent, because whether or not the SRO relied on evidence of Ridge's general educational

milieu, a preponderance of the evidence supports the SRO's decision that Ridge was an appropriate placement for E.M.

"Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d at 112. "A private placement is appropriate if it is reasonably calculated to enable the child to receive educational benefits, such that the placement is likely to produce progress, not regression." T.K. v. N.Y.C. Dep't of Educ., 810 F.3d 869, 877 (2d Cir. 2016). "In determining whether a placement reasonably serves the educational needs of a child with a disability and is likely to produce progress, [the Court] consider[s] the totality of the evidence, including grades, test scores, regular advancement, or other objective evidence." Id. "No one factor is necessarily dispositive." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d at 112.

"The test for the private placement is that it is appropriate, and not that it is perfect." T.K. v. N.Y.C. Dep't of Educ., 810 F.3d at 877–78. "Parents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE because parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a FAPE." Id. at 878.

"A unilateral private placement is only appropriate if it provides education instruction specifically designed to meet the unique needs of a handicapped child." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d at 115 (emphasis removed). "Indeed, even where there is evidence of success, courts should not disturb a state's denial of IDEA reimbursement where . . . the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not." Id.

1. "General Educational Milieu"

As an initial matter, even if the SRO misinterpreted Second Circuit law—an issue this Court does not reach here—it is not at all clear the SRO's misinterpretation affected his determination that Ridge was an appropriate placement for E.M.

The SRO held: "Although the district asserts that the hearing record does not demonstrate how Ridge modified its instruction to address the student's unique needs or how the 1:1 instruction delivered at Ridge was specialized to meet the student's needs, the hearing record supports finding that the student received instruction tailored to meet his academic, attending, and social-emotional needs." (SRO Dec. at 26–27). That holding is consistent with the requirement that "[a] unilateral private placement . . . provide[] education instruction specifically designed to meet the unique needs of a handicapped child." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d at 115 (emphasis removed).

Further, in the two instances in which the SRO discussed his reading of the law as permitting decisionmakers to rely on evidence of general educational milieu, the SRO stated such a standard was an additional reason for finding Ridge was appropriate. (SRO Dec. at 27 ("Additionally, . . . courts have recently deemed evidence of the general educational milieu of a unilateral placement sufficient for purposes of tuition reimbursement." (emphasis added)); id. ("Accordingly, and particularly in light of the more relaxed standard increasingly applied by courts" (emphasis added))).

2. Deference

Moreover, the SRO's decision is clearly entitled to deference, as it was well-reasoned, based on substantially greater familiarity with the evidence and the witnesses than this Court, grounded in thorough and logical reasoning, and based on the same evidence as presently before

the Court. Indeed, "the question of whether a private school placement provided special education services is precisely a question on which we defer to educational experts." W.A. v. Hendrick Hudson Cent. Sch. Dist., 927 F.3d 126, 147 (2d Cir. 2019). And "a reviewing court is not entitled to overrule the State on a question of educational policy—such as whether a generally available resource is specially tailored to a particular disabled student's needs—based merely on its own disagreement with the State's evaluation of that resource." Id. at 149.

### 3. Preponderance of the Evidence

Even if the SRO improperly relied on evidence of "general educational milieu," it was harmless error, as a preponderance of evidence supports finding E.M.'s placement at Ridge was "reasonably calculated to enable the child to receive educational benefits, such that the placement is likely to produce progress, not regression." T.K. v. N.Y.C. Dep't of Educ., 810 F.3d at 877.

Here, the SRO properly found Ridge addressed E.M.'s unique needs, including his (i) "significant academic delays," (ii) "difficulty attending," and (iii) "limited ability to socialize and interact with peers independently." (SRO Dec. at 19).

Regarding E.M.'s academic delays and difficulty attending, as the SRO and IHO both concluded, Ridge creates "an educational setting reflecting 'the best way that [the student] learns.'" (SRO Dec. at 19 (quoting IHO Dec. at 27 (alterations in original))). All of the students at Ridge are on the autism spectrum, and none has any extreme behavioral issues. (Tr. at 880, 882); cf. T.K. v. N.Y.C. Dep't of Educ., 810 F.3d at 878 (concluding private school was appropriate placement in part because the student was classified as learning disabled, and the state-approved private school was devoted to students with learning disabilities).

Ridge has only six students, four full-time staff, and approximately seven volunteer and part-time staff, providing E.M. with a very small class size and extensive support. Cf. T.K. v. N.Y.C. Dep't of Educ., 810 F.3d at 877 ("Plaintiffs were advised by a private psychologist that [the student] needed a more supportive academic environment in a small, special education class and school for children with solid cognitive potential who need a supportive and specialized approach for learning"). Ridge also provides 1:1 instruction for math and writing depending on each student's needs. Further, Ridge focuses on each student's individual interests, and incorporates each student's interests into their "every day learning because then everybody learns each other's interests." (Tr. at 883). Ridge also uses a "high interest [low] vocabulary series" (id. at 913); tries to plan at least two field trips a month that "have to do with whatever is being taught during the week," making it "a more hands-on" experience and involving "more meaningful discussion than just simply reading it through a textbook" (id. at 891); and provides opportunities for peer mentoring.

As for E.M.'s difficulties socializing and interacting with peers, Ridge's director of special education testified instruction in social skills took place "daily[,] sometimes hourly . . . based on the needs of what is going on throughout the day." (Tr. at 931). She described that the day begins with homeroom, during which the students can discuss "their evening before, what they expect to happen during the day, what might be happening . . . later in the day and that evening at home," "the weather," "the news," and "current events." (Id. at 884–85). In class, the students interact during "open discussion." (Id. at 932). During teaching, if "they're not interacting with each other, they're listening to what's going on and at different times during the lesson different students are reading out loud," thereby "using social skills in the sense that they learn how to take turns" and share ideas. (Id. at 932–33.). Moreover, as discussed above, each

student "learns each other's interests." (Id. at 883). At the end of the day, there is a fifteen to thirty minute "regroup" period during which students discuss the day, can receive extra instruction if they want it, and can catch up on work. (Id. at 887). In addition, the field trips allow the students "to use their socialization skills outside of a classroom setting." (Id. at 953).

Evidence of E.M.'s progress at Ridge in each of his three areas of needs—attending, academic, and social—also support the SRO's decision. Cf. T.K. v. N.Y.C. Dep't of Educ., 810 F.3d at 877 (IHO and SRO had found the student "made progress across the board [at the private placement school], both academically and behaviorally," and thus the school "proved to be a successful match").

First, concerning E.M.'s difficulties attending, the SRO concluded those difficulties were "not identified as a significant concern at Ridge, by either the parent or the director of special education." (SRO Dec. at 26 (citing Ex. 4 at 3, 4, 7, 25–26)). Indeed, there is no evidence in the record that E.M. continued to have difficulties attending at Ridge.

Second, Ridge's director of special education testified E.M. "made progress in all areas of reading," "listening comprehension," and "math computation," although he still had some difficulty in math problem solving. (Tr. at 913). She testified that in math, by the end of the year, E.M. was "[b]orrowing successfully and carrying successfully." (Id. at 973–74). In reading, E.M. went from "being able to read and comprehend three- and four-sentence paragraphs" to "being able to read and comprehend a three- or four-paragraph story page." (Id. at 974). Moreover, at the beginning of the year, E.M. was doing so with "maybe 50 percent accuracy," and "at the end of the year a hundred percent accuracy." (Id.). At the beginning of the year, "it was out loud," and "at the end of the year it was independent." (Id.). According to the director of special education, E.M.'s reading "went from a middle second grade to a high

fourth grade ability," which she characterized as "[t]wo years academics growth in 15 months."

(Id. at 974–75). E.M.'s mother likewise testified: "[H]e likes to read. He will read with me and

he's reading a lot, lot better. He's not a hundred percent, but he's reading really better, much

better. And I owe that all to Ridge." (Id. at 1047).

Third, regarding E.M.'s difficulties socializing with peers, comments on E.M.'s report

card indicate E.M. "contributes to class discussions," "loves to help get and replace materials,"

"takes care of the fish and makes sure they are fed regularly, and plays and enjoys teaching

others how to play chess. (Ex. F). The director of special education testified: "[A]t first [E.M.]

was a little reserved. But as his school year had progressed, . . . he's become more self-reliant

and definitely more part of the group"; "by Christmas he was definitely very much a part of the

group," he interacts well, and is "able to initiate." (Tr. at 903–04). She further testified he did

not show anxiety about peer acceptance, "works very well either in pairs or groups," "enjoys

being with the other students," and "would rather be with the other kids" during math instruction.

(Id. at 907–08). In addition, according to the director, E.M. has friends at Ridge and is "much

more outgoing" and "more verbal." (Id. at 909).

E.M.'s mother similarly testified that since attending Ridge, E.M. was "more assertive,

which helps him to get along better with his brother." (Tr. at 1045–46). She further testified

E.M. "likes to talk about school" and "participates in the parties at school," "talks to his peers"

and "talks about them," and "likes to go out more." (Id. at 1046). As to her last comment, she

elaborated: "It used to be pulling teeth to get the kid to go out. No[w] he wants to go out, he

wants to go to the library." (Id.). In addition, she testified E.M. has "a wider range of interests"

beyond just animals, and was "engaging"—she could "actually talk to him," he was playing with

his cousins, and he was engaging and talking with his aunts and uncles. (Id. at 1046–47).

Thee record before the SRO also contains objective evidence of E.M.'s improvement. As the SRO stated, E.M. "attained higher percentile ranks in all of the areas tested on the June 2018 administration" of the Woodcock Reading Mastery Test as compared to when he took the test in March 2017. (SRO Dec. at 24 (citing Ex. H)).

On this point, the District argues Ridge's administrators lacked the professional development necessary to effectively administer the test or to interpret the results. The District further argues the timing of the tests undercuts any claim that improvements in E.M.'s scores could be attributed to Ridge: the March 2017 exam was administered eight months before E.M. was enrolled at Ridge, and the June 2018 exam was administered seven months after his enrollment.

The test scores still support a finding that E.M. progressed. The IHO specifically considered the first argument and decided the test results "can be taken as showing some degree of measurable progress." (IHO Dec. at 28). As for the District's argument regarding the timing of the tests, although it may detract from the impact of the test scores, it does not render them meaningless. As noted above, the Court is "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d at 113. Both the IHO and SRO found the increase in scores persuasive; the Court declines to substitute its "own notions of sound educational policy for those of the school authorities which [it] review[s]." Id. at 112–13.

The District's remaining arguments address other asserted deficiencies in Ridge's program. For instance, the District argues (i) Ridge did not address E.M.'s need for speech-language therapy, occupational therapy, or counseling; (ii) Ridge students are excused from

reading if they struggle, which amounts to ignoring students' needs; and (iii) Ridge did not develop specific written goals for E.M.

The SRO identified evidence that Ridge addressed some of E.M.'s needs related to occupational therapy and speech-language therapy. Regarding occupational therapy, Ridge provided E.M. with 1:1 instruction in handwriting. As for speech-language therapy, the director of special education testified Ridge worked on language pragmatics "[e]very day, almost every hour." (Tr. at 914). Further, as the SRO noted, the students at Ridge practice their pragmatic skills during field trips by "ordering and paying for lunch, making sure they have money, and that they are being socially appropriate during lunch." (SRO Dec. at 23 (citing Tr. at 892)).

Concerning the other deficiencies identified by the District, both the IHO and the SRO recognized that Ridge was not an "ideal" placement. (SRO Dec. at 27; IHO Dec. at 29). Indeed, the SRO specifically acknowledged that Ridge "cannot be said to have addressed the student's need for counseling services." (SRO Dec. at 24). Likewise, both the IHO and SRO recognized Ridge had not produced documentation as to its specific plans for E.M. But "[p]arents need not show that a private placement furnishes every special service necessary to maximize their child's potential." T.K. v. N.Y.C. Dep't of Educ., 810 F.3d at 878. "They need only demonstrate that the placement is reasonably calculated to enable the child to receive educational benefits." Id.

In weighing "the totality of the circumstances," the SRO, while recognizing Ridge's deficiencies (including specifically its failure to address E.M.'s need for counseling services) found that Ridge was an appropriate placement. (SRO Dec. at 24). That decision is entitled to deference and is supported by a preponderance of the evidence.

Accordingly, the Court affirms the SRO's decision that Ridge was an appropriate private placement.

**CONCLUSION**

The District's motion for summary judgment is DENIED.

The Parents' motion for summary judgment is GRANTED.

The Court therefore affirms the decision of the SRO and dismisses the complaint.

The District is ORDERED to provide direct funding or reimbursement of E.M.'s tuition

at The Ridge School for the 2017–2018 school year.

The Clerk is instructed to terminate the motions (Docs. ##9, 15) and close this case.

Dated: January 30, 2020
     White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge